IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA

| | | |
|---|---|---|
| WINDBER HOSPITAL d/b/a CHAN | : | No:  3:20-cv-00080-KRG |
| SOON SHIONG MEDICAL CENTER, | : | |
| on behalf of himself and all others | : | |
| similarly situated | : | |
| | : | |
| Plaintiff, | : | COMPLAINT – CLASS ACTION |
| | : | |
| | : | |
| vs. | : | |
| | : | |
| TRAVELERS PROPERTY CASUALTY | : | |
| COMPANY OF AMERICA | : | JURY TRIAL DEMANDED |
| | : | |
| Defendant. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION
## FOR SUMMARY JUDGMENT

### Overview

The Windber Hospital d/b/a Chan Soon Shiong Medical Center ("Windber) is the named

insured under a policy issued by the Travelers Property Casualty Company of America

("Travelers"). A copy of the Policy is attached to the Complaint as Exhibit "A". On March 19,

2020, on March 23, 2020, April 1, 2020 and April 20, 2020, Governor Tom Wolfe issued various

Orders necessitating the partial suspension of operations of the medical facility of Windber. See

Complaint, ¶¶ 11-24.  Accordingly, Windber made claim upon Travelers seeking coverage under

the terms of the policy when there is a necessary suspension of operations.  Travelers denied

coverage.  A copy of the letter from Travelers is attached as Exhibit "B" to the Complaint.

Windber then instituted this lawsuit.  Travelers has filed a Motion for Judgment on the Pleadings which Windber opposes.  In turn, Windber has filed this Motion for Summary Judgment.[1]

## Summary of Argument

In order for an insured to be entitled to coverage, two things must be true. First, the insured's claim must be encompassed by one or more of the insuring agreements in the policy. Second, none of the exclusions in the policy can be applicable.  Based upon the undisputed facts in this matter, Windber is entitled to coverage both under the "Business Income" insuring agreement in the policy,[2] and under the "Civil Authority" insuring agreement in the policy.[3] Moreover, no exclusion eliminates the coverage that Windber is seeking, namely, the coverage for "continuing normal operating expenses".[4]

## Argument

### (a)  If the Insured's Interpretation of the Policy Language is Reasonable, the Insured's Interpretation Must Be Adopted

The methodology to be employed in resolving the legal coverage dispute is of prime importance.  When interpreting an insurance policy, any ambiguity must be construed in favor of the insured.  Ambiguity exists where more than one reasonable interpretation of policy language is present.  Here, there are two interpretations of the policy language, namely that of Travelers and

---

[1]  Windber asserts that it is entitled to Judgment as a matter of law.  As such, it opposes the Motion for Judgment on the Pleadings of Travelers while, at the same time, seeking Summary Judgment in its favor on the legal coverage issues.

[2] See part (b) of this memorandum.

[3] See part (c) of this memorandum.

[4] See part (e) this memorandum.  Windber is not seeking coverage for any other benefit, such as lost profits.

that of Windber.  If Windber's interpretation of the policy is reasonable, i.e. interpretation of the words used in the policy reasonably supports the insured's position, then the policy is ambiguous. That ambiguity is to be resolved in favor of the insured, i.e. Windber.  As such, Windber must be afforded coverage.   The position of the insurer must be rejected.  In fact, it is irrelevant whether the insurer's interpretation may be considered to be more reasonable than the insured's interpretation.   In fact, adopting Travelers' position in that context, would be resolving the ambiguity in favor of the insurer, in direct contravention of Pennsylvania law.  As discussed in the leading treatise on insurance coverage issue, Windt, Insurance Claims & Disputes (Thomson/West 2013 6th Edition) (2020 Supplement), Section 6.2, pages 6-60 to 6-62, a policy is ambiguous if "it can be given two alternate reasonable interpretations," and if an ambiguity exists, "the interpretation that is most favorable to the insured will be adopted".  In fact, as discussed in Windt, Section 6.2, page 6-65:

> It is not enough for the insurer's interpretation to be adopted that its interpretation is more reasonable than the insured's interpretation. Otherwise, one would be resolving the ambiguity in favor of the insurer, in contravention of the foregoing rules.

Among the cases cited in Windt and the 2020 Supplement are Medical Protective Co. v. Watkins, 198 F.3d 100, 104 (3d Cir. 1999) (Pennsylvania law) (Insurer argued that an exclusion applied, and the court did not dispute that the insurer's interpretation was reasonable. The court nevertheless held in favor of the insured because ''the interpretation offered by the insured was also reasonable.'' The court also reiterated the principle that ''if a court should err in determining the meaning of an insurance policy provision, its error should be in favor of coverage for the insured''); Weisman v. Green Tree Ins. Co., 447 Pa. Super. 549, 670 A.2d 160, 162 (1996) (Although the insured's suggested definition of the word ''explosion'' in the policy

was not ''commonly used,'' court held in favor of the insured because the word ''explosion'' was ''susceptible to more than one meaning''); General Refractories Co v. First State Ins. Co., 94 F. Supp.3d 649, 658, 660 (E.D. Pa. 2015) ("Where more than one reasonable construction exists, the construction that favors coverage must be applied." "As between Travelers and (the insured), which proffers the more reasonable interpretation... is not decided here." It is enough that the insured's interpretation "is objectively reasonable. Travelers has not met its burden of showing that (the insured's) interpretation is not reasonable"). See also, e.g., Perry v. Allstate Indem Co., 953 F.3d 417, 421 (6th Cir. 2020) (Ohio law) ("It will not suffice for the insurer to demonstrate that its interpretation is more reasonable than the policyholder's. Instead, in order to defeat coverage, the insurer must establish not merely that the policy is capable of the construction that it favors, but rather that such an interpretation is the only one that can fairly be placed on the language in question. If the policy is ambiguous, and the insured's interpretation is reasonable, the insured prevails")(emphasis in original); Mitchell v. State Farm Fire & Cas. Co., 954 F.3d 700,706 (5th Cir. 2020) (Mississippi law) ("Since (insured's) interpretation... must prevail if the term is ambiguous, we need only determine whether (the insured's) interpretation is a reasonable one - - not necessarily the most reasonable"). Using this methodology, which it must, the Court is compelled to find in favor of Windber.

As discussed more fully in this Memorandum, both Travelers and Windber posit reasonable interpretations of the "Business Income" portion and the "Civil Authority" portion of the policy that lead to the conclusion that the insured is entitled to coverage under both of those coverage parts by reason of the government's virus related directives. Travelers need not argue that its interpretation of the policy is reasonable. This is certainly so. The only issue is whether Windber's policy interpretation is also reasonable. If it is, the policy is ambiguous; that ambiguity

can only be resolved one way.  This Court is bound to conclude that Windber is entitled to coverage under both of those coverage parts.  Any argument of Travelers that its interpretation of the policy language is more reasonable is of no consequence.  Travelers cannot prevail by arguing that its reasonable interpretation  of policy language leads to the conclusion that coverage does not exist. While Travelers' interpretation is arguably reasonable, the only way that Travelers can prevail is if the policy interpretation set forth by Windber is absurd.  If Windber's interpretation is reasonable, which is manifestly the case, an ambiguity exists which ***must*** be resolved in favor of Windber.[5]  Judgment should be entered in favor of Windber in this case.

### (b)  Coverage Exists Under the Insuring Agreement in the Business Income Portion of the Policy

#### (1)  Generally

The prerequisite to coverage under the insuring agreement for "Business Income"[6] is that the suspension of the insured's operations have been caused by  "direct physical loss of  or damage to property" at the insured premises (Windber's medical center). Coverage exists, therefore, either: (a) if Windber suspended operations because of a direct physical loss ***of*** property; or (b) if Windber suspended  operations because of direct physical damage ***to*** property.[7]  For the reasons discussed below, the policy language can reasonably be interpreted to lead to the conclusion that Windber's

---

[5]  It is for the Court to interpret the insurance policy.  See Republic Franklin Insurance Co. v. Brothern Mutual Insurance Co., 436 F. Supp. 3d 817-820 (E.D. Pa. 2020).  That interpretation should be in favor of Windber.

[6] See the first page of the Business Income Coverage form.

[7] The loss must also have been caused by a Covered Cause of Loss. That issue is discussed later in this memorandum.

suspension of operations was caused both by a direct physical loss *of* and by direct physical damage *to* property. For two independent reasons, therefore, the prerequisites to coverage under the "Business Income" coverage part have been satisfied.

(2)   **Direct Physical Loss**

The insuring agreement for Business Income, set forth on the first page of the Business Income policy form, uses the phrase "physical loss of or damage to" property. The word "loss," as defined in the dictionary, can mean either of two things: (1) detriment/disadvantage, or (2) something that is lost (cannot be found).[8]  By predicating coverage upon either "loss of" property or "damage to" property, the term loss of can only mean "loss of use" of the property.  The term "of" following loss is important.  The policy does not reference "loss to" property.  Travelers will argue that under the specific words of the Business Income insuring agreement, "loss of" property can only mean "unable to find".  The word "loss" is used in conjunction with the word "of", i.e. the policy references "loss. . . of" property.  Travelers' argument is without merit.  As explained below, the only thing that the words "loss of...property" can refer to is a "loss of" use of the property.  In short, Travelers has used, in its policy, words that do have a clear meaning, which create an ambiguity; that ambiguity must be resolved in favor of the insured, Windber.

Focus, therefore, must be directed to the language of the Business Income insuring agreement. After stating that coverage can exist for "physical loss of ...property" <u>or</u> for "physical... damage to property," the insuring agreement then goes on to say that the "loss or damage" must be caused by or result from a Covered Cause of Loss. A Covered Cause of Loss means "direct

---

[8]Dictonary.com.

physical loss."[9] As discussed above, a "loss" can mean a detriment/disadvantage or something that is lost. Putting that all together, the insuring agreement provides as follows:

A.    Coverage exists if the suspension of the insured's operations was caused by "direct physical loss of ...property" if the loss of property was caused by direct physical detriment to property.

AND

B.    Coverage exists if the suspension of the insured's operations was caused by "direct physical... damage to property" if the damage to the property was caused by direct physical detriment to property.

If, as Travelers contends, the words "loss of ... property" mean lost (cannot be found), the first of the foregoing coverages would not make sense. Replacing the words "loss of property" with property that has been "lost," the insurance agreement would read as follows:

A.    Coverage exists if the suspension of the insured's operations was caused by property that has been lost if being unable to find the property was caused by or resulted from direct physical detriment to the property (or from being unable to find the property).

That makes no sense. One thing, therefore, is irrefutable. When the words "loss of" property are used in the Business Income insuring agreement, they mean something other than property that has been lost. What, then, do the words mean? The only other possible definition of the words "loss of" property is a loss of use of the property. (At minimum, that is a reasonable interpretation.) That is true because it is only if the words "loss of ...property" mean loss of use that the insuring agreement makes sense.   The insuring agreement would reasonably read as follows:

A.    Coverage exists if the suspension of the insured's operations was caused by property that could not be used if the property could not

---

[9]Page two of the Business Income Coverage Form states, in relevant part, that Covered Causes of Loss means "direct physical loss...."

be used because of, or as a result of, direct physical detriment to property.

At a minimum, that is a reasonable policy interpretation.  As such, Judgment must be entered in favor of Windber.

What's more, the insurance policy uses the phrase "physical loss of or (physical) damage to" property elsewhere in the policy, and (consistent with the use of that phrase in the Business Income insuring agreement) when the phrase is used, it cannot mean property that has been lost. For example, paragraph g(2), on page 7 of the basic Property Coverage Form, states that coverage exists for "direct physical loss of or damage to"  property caused by "fungus, wet rot or dry rot." If the words "loss of" property meant "lost (cannot be found), that provision would be nonsensical, since adding fungus or rot to a product would not cause the product to be "lost" (unable to be found). Necessarily, therefore, for the additional reason, when the same words - - "loss of" property - - are used in the Business Income insuring agreement in the policy, the words mean something other than property that has been lost (cannot be found).[10]

Similarly, paragraph 4(b)(1), on page 2 of the Business Income Coverage form, states that coverage exists if there is "physical loss of or damage to property" caused by a suspension of

---

[10]The same words used in different insuring provisions of an insurance policy must be given the same meaning. See, e.g., ML Direct, Inc. v. BIG Specialty Insurance Co., 79 Cal. App. 4th 137, 93 Cal. Rptr. 2d 846, 850 (2d Dist. 2000) (''words used in a certain sense in one part of a contract are deemed to have been used in the same sense elsewhere''); Solvent Underwriters Subscribing to Energy Ins. Intern., Inc. Cover Note No. ECI-3824 v. Furmanite America, Inc., 282 S.W.3d 661, 670 (Tex. App. Houston 14th Dist. 2009), review denied, (Aug. 21, 2009) (applying Texas Supreme Court's rule that "words used in one sense in one part of a contract are, as a general rule, deemed to have been used in the same sense in another part of the instrument, where there is nothing in the context to indicate otherwise"); Atlantic Permanent Federal Sav. and Loan Ass'n v. American Cas. Co. of Reading, Pa., 839 F.2d 212, 219-20 (4th Cir. 1988) ("We think it highly unlikely that the parties intended the term 'loss' . . . to have a different meaning in calculating the applicable deductible than it has in determining the insurer's maximum coverage" under the insuring clause).

operations at a dependent property. Once again, if the words "loss of" meant "lost" (cannot be found), that provision would be nonsensical, since a suspension of operations would not cause property to be "lost" (unable to be found).   In the same vein, the first paragraph of the Utility Services endorsement states that coverage exists "for loss of or damage to" property caused by an "interruption of utility service." Once again, if the words "loss of" meant "lost (cannot be found), that provision would be nonsensical, since an interruption of utility services would not cause property to be "lost" (unable to be found).

Briefly summarizing, the words "loss of ... property" in the Business Income insuring agreement should be interpreted to mean loss of use of the property. As discussed above, because of the "Covered Cause of Loss" requirement the policy affords coverage if there has been "direct physical loss of or damage to property." The words "loss of...property" mean something other than "damage to property,"[11].  As discussed above, they cannot mean property that has been lost. It is reasonable, therefore, to interpret the "loss of" property language to be applicable when there has been a loss of use of the property. That gives the word "loss" meaning and takes into account the existence of the word "of" in the policy language. As a result, it is reasonable to conclude that coverage exists in the matter at hand because, by reason of the government directive, Windber has

---

[11]When one speaks of a "loss of property," one is obviously saying something different than a "loss to property." By the same token, when one speaks of a "loss of property," one is obviously saying something different than "damage to property." Moreover, the insuring agreement already states that it applies to "damage to property." In order to give the words "loss of property" meaning, therefore, the words have to mean something other than "damage to property." It is a fundamental rule of insurance contract construction that the words used in a policy should not be given an interpretation that would render the words superfluous. E.g., Lower Paxton Tp. v. U.S. Fidelity and Guar. Co., 383 Pa. Super. 558, 557 A.2d 393, 402 (1989) (policy should not be interpreted so as to render a word in the policy ''surplusage'');Continental Ins. Co. v. McKain, 820 F. Supp. 890, 897 (E.D. Pa. 1993), judgment aff'd, 19 F.3d 642 (3d Cir. 1994) (''when there are alternative readings of a clause in a contract, the rule of construction is that the one that avoids surplusage should be chosen'').

been unable to use its medical center (the insured premises). That is, it is reasonable to say that there has been a "physical loss of property" because there has been a loss of use of the (physical) building.

Unsurprisingly, the case law is consistent with the foregoing analysis. Courts interpreting the same policy language that is at issue in the matter at hand have held that there can be a physical loss of a building without there having been a physical alteration of the building. It is enough that there has been a loss of use of the building.  Illustrative cases include <u>Murray v. State Farm and Cas. Co.</u>, 203 W.Va. 477, 509 SE.2d 1, 17 (1998) ("'Direct physical loss'... may exist in the absence of structural damage to the insured property.... Losses... rendering the insured property <u>unusable</u> or uninhabitable" can be covered "in the absence of structural damage to the insured property") (emphasis added); <u>Sentinel Management Co v. New Hampshire Ins. Co.</u>. 563 NW.2d 296, 300 (Minn. App. 1997) ("Direct physical loss may exist in the absence of structural damage to the insured property....Although asbestos contamination does not result in tangible injury to the physical structure of a building, a building's function may be seriously impaired or destroyed and the property rendered <u>useless</u> by the presence of contaminants")(emphasis added); <u>Matzner v. Seaco Ins. Co.</u>, 9 Mass L. Rptr. 41, 1998 WL566658 (Sup.Ct. August 12, 1998) ("(T)he phrase 'direct physical loss or damage' is ambiguous in that it is susceptible of at least two different interpretations. One includes only tangible damage to the structure of insured property. The second includes a wider array of losses")  (collecting cases); <u>Motorist Mut. Ins Co. v. Hardinger</u>, 131 Fed. Appx. 823, 826 (3d Cir. 2005) ("direct physical loss or damage" requirement satisfied by e-coli, which had "reduced the <u>use</u> of the property to a substantial degree") (emphasis added); <u>Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.</u>, 311 F.3d 226, 236 (3d Cir.

2002) (New York and New Jersey law).  (T)he policies cover "physical loss," as well as damage. When the presence of large quantities of asbestos in the air in a building is such as to make the structure uninhabitable and <u>unusable</u>, then there has been a distinct loss to its owner. (Emphasis added)).  To sum up, the interpretation given the words "physical loss of property" by the foregoing courts is, at a minimum, reasonable.  As made clear by the above discussion, it is reasonable to say that there is a "physical loss of" use of a building when the building cannot be used. Windber's building could not be fully used because of a government directive.   As a result, subject to one proviso, Windber is entitled to coverage because its suspension of operations at the building was caused by the fact that the building could not be used. The proviso is that, as discussed above, the government directive (the cause of the loss of use) must itself have been caused, at least in part, to direct "physical loss":[12] that is, tied to a physical detriment.[13] That connection exists because (1)

---

[12]The immediate cause of the business suspension was the government directive. The indirect (proximate) cause of the business suspension was the physical loss. The policy language does not (unambiguously) require that the immediate cause of the business suspension have been physical loss.  To the contrary, <u>any</u> cause will suffice. The policy requires only that the suspension of the insured's operations have been "caused by" physical loss. A "cause" can be direct, indirect, proximate, etc. At a minimum, therefore, the policy is ambiguous with regard to whether an indirect proximate cause is sufficient. That is, since the policy uses the word "caused" (instead of "directly caused"), the policy can reasonably be read to allow an indirect (proximate) cause to suffice. E.g., <u>SW Energy Corp v. Continental Ins. Co.</u>, 1999 UT 23, 974 P.2d 1239, 1243 (1999) (Exclusion eliminated coverage for damage "caused by" corrosion. Court held that "caused by" unambiguously included damage even indirectly caused by corrosion, since "the language of the policy does not distinguish between direct and indirect losses").

When Travelers wanted to limit its coverage to "direct" causes, it did so. See, for example, paragraph 4(a), on the second page of the Crime Coverage form. The paragraph states that in order to be entitled to coverage for money orders, the loss/damage had to have "result(ed) directly" from certain actions.  Accordingly, in that coverage part, Travelers elected to limit the risk that it assumed to direct causes. Travelers was unwilling to cover loss that had indirectly been caused. By comparison, in the Business Income portion of the policy, Travelers did not elect to limit its coverage to direct causes

[13]As discussed above, the dictionary definition of the word "loss" is "detriment."

11

the loss of use of the insured's premises was caused by the government's stay-at-home directive, and (2) consistent with the discussion in the next section of this memorandum, the government's stay-at-home directive was caused, in part, by a physical detriment to property - - virus on building surfaces in the city.[14]   The connection would exist, however, even if there had not actually been a virus on building surfaces in the city. The policy's definition of "covered cause of loss" is satisfied merely by the "risk of direct physical loss."[15] The word "risk" must be given effect. That is, the policy provision cannot be given the meaning that it would have had if the word "risk" had not been included in the provision.[16] Accordingly, the "covered cause of loss" requirement was satisfied merely by the fact that the government's stay-at-home directive was caused, in part, by the <u>risk</u> of a physical detriment to property.

### (3)   Direct Physical Damage

The virus is on surfaces, including building surfaces, from which the virus can come into contact with people. The question, therefore, insofar as coverage is concerned, is whether the virus, when it is on building surfaces, constitutes damage to the building. The answer is yes it does. As

---

[14]The next section of this memorandum discusses the fact that, consistent with analogous case law, the presence of the virus on building surfaces constitutes "damage" to the building. Even if, however, the virus on a building's surface does not constitute "damage" to the building, it is certainly reasonable to say that the virus on a building's surface constitutes a "detriment" to the building.

[15]Enclosed as Exhibit "A" are copies of industry-standard Insurance Services Office policy forms in which the term "covered cause of loss" is defined as a "direct physical loss" and does <u>not</u> include the word "risk." Paragraph 3, on the second page of the Business Income Coverage Form, states that the definition of "Covered Cause of Loss" is set forth in the "Causes of Loss" form, and the first paragraph of the Causes of Loss form defines a Covered Cause of Loss as a "direct physical loss," not as a "risk of direct physical loss."

[16]See, e.g., <u>Lower Paxton Tp v. U.S. Fidelity and Guar Co.</u>, 383 Pa. Super. 558, 557 A.2d 393, 402 (1989) (policy should not be interpreted also as to render a word in the policy "surplusage").

a result, coverage exists not only because of the "loss of" language in the policy (discussed above), but also because of the "damage to" language in the policy.

By way of background, the courts around the country are split with regard to whether the words "physical damage" require a physical alteration of an object,[17] or whether it is enough that there has been a physical change of condition. A well-reasoned case adopting the latter rule is Oregon Shakespeare Festival Assn. v. Great American Ins. Co., 2016 WL 3267247 (D. Or. March 16, 2017), vacated by stipulation of the parties, 2017 WL 1034203. In that case, smoke, soot and ash from wildfires "accumulated on the surface of the hard plastic seats and concrete ground of (the insured's) open air theater." The insured sought business income loss coverage for the performances that were cancelled "due to poor air quality and the related health concerns," even though the soot and ash "had been cleaned up... well before any scheduled performances...."

The policy in the Great American case conditioned coverage on the suspension of the insured's operations having been "caused by direct physical loss of or damage to property at the (insured) premises....".  The insurance company denied coverage because there had not been "any permanent or structural damage to (the insured's) property." The court held in favor of the insured, stating:

> In this case, the parties disagree over the term "direct physical loss of or damage to covered property."
>
> *          *          *
>
> (The insured) defines the term in question by relying on Webster's dictionary, defining "physical" as "of or belonging to all created existence; relating to or in accordance with the laws of

---

[17]See the Port Authority case, discussed in section (b)(2) of this memorandum .

nature; of or relating to natural or material things as opposed to things mental, moral or spiritual.... (The insured) distills this definition down to mean a "natural or material thing." "Loss" is defined as the "state or act of being destroyed or placed beyond recovery" or the amount of an insured's financial detriment due to occurrence of a stipulated event..." Id.  "Damage" means "loss due to injury;" injury or harm to person, property, or reputation." Id. (The insured) asserts that these definitions, taken together, create a plain meaning of "physical loss or damage" as "any injury or harm to a natural or material thing." Based on this interpretation, (the insured) claims that the wildfire smoke caused injury or harm to the interior of the theater, which include the air within the theater.

\*          \*          \*

In Farmers Ins. Co. of Oregon v. Trutanich, 123 Or. App. 6, 858 P.2d 1332 (1993), the Oregon Court of Appeals was asked to determine whether or not a "pervasive odor" in a residential home caused by a subtenant's illegal methamphetamine operation was considered a "direct physical loss".... (The court held that it was a direct physical loss.)

Trutanich was cited favorably along with Largent v. State Farm Fire & Cas. Co., 116 Or.App. 595, 842 P.2d 445(1992), by District of Oregon Judge Hubel to stand for the proposition that "physical damage can occur at the molecular level and can be undetectable in a cursory inspection." Columbiaknit, Inc. v. Affiliated FM Ins. Co., 1999 WL 619100, at \*6 (D. Or. Aug. 4, 1999).

\*          \*          \*

Additionally, this Court finds a District of New Jersey case to be extremely persuasive based on the similarities of the facts and the insurance policy terms at issue. In Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am., 2014 WL 6675934, at \*3 (D.N.J. Nov. 25, 2014), an accidental release of ammonia into a packaging facility caused the facility to be shut down for one week while the ammonia dissipated. The evidence in the record showed that in order to remedy the problem, the facility had to "air the property" and hire an outside company "to do the cleanup... Wash down anything with water ... [They] brought in dry ice, trying to neutralize the [ammonia] inside the plant. Set up fans and all that." Id. at \*4. The

defendant insurance company asserted that the incident was not covered because "physical loss or damage" necessarily involves a "physical change or alteration to insured property requiring its repair." Id. at *2. The court disagreed, noting that "while structural alteration provides the most obvious sign of physical damage," various courts have found "that property can sustain physical loss or damage without experiencing structural alteration." Id. at *5. See also Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co., 406 N.J. Super. 524, 543, 968 A.2d 724, 736 (App. Div. 2009) (holding that property can be physically damaged, without undergoing structural alteration, when it loses its essential functionality). The court concluded that the packaging facility incurred "physical loss or damage" when ammonia gas was discharged into the facility's air... and rendered the facility temporarily unfit for occupancy." Id. at *8.

Other courts around the country have held that damage does not have to be "structural" to be "physical," as long as it renders the property unusable for its intended purpose. See, e.g., Western Fire Ins. Co. v. First Presbyterian Church, 165 Colo. 34, 437 P.2d 52 (1968) (where gasoline vapors penetrated the foundation of the insured church and accumulated, rendering building uninhabitable, the property was held to have suffered a "direct, physical loss"); Matzner v. Seaco Ins. Co., 1998 WL 566658 (Mass. Super. 1998) (holding that carbon monoxide levels in an apartment building sufficient to render building uninhabitable were a "direct, physical loss").

*                *                *

In this case, wildfire smoke infiltrated the interior of the theater, making it uninhabitable and unusable for holding performances. Like the home infiltrated by methamphetamine odor, or the furnace contaminated by lead particles, or the facility filled with ammonia, the theater filled with smoke was unusable for its intended purpose. Even though the loss or damage was not structural or permanent, the property experienced a loss of "essential functionality." ... Based on the case law, as discussed above, the Elizabethan Theatre sustained "physical loss or damage to property" when the wildfire smoke infiltrated the theater and rendered it unusable for its intended purpose.

15

Accord, e.g., <u>Travco Ins. Co. v. Ward</u>, 715 F. Supp.2d 699, 703, 707–708 (ED Va 2010), wherein

the Court reasoned:

> The Ward Residence contains walls that were constructed using sheets of Chinese Drywall ("the Chinese Drywall"). Over time, the Chinese Drywall in the Ward Residence has released sulfuric gas into the residence.

> \*          \*          \*

> With regard to the claim for the cost of removing the Chinese Drywall, (the insurer) argues that "the Drywall has not sustained a 'direct physical loss,' and therefore does not fall within the grant of coverage in the Policy....

> \*          \*          \*

> The parties disagree as to whether the Ward Residence has suffered a "direct physical loss".... (The insurer) argues that there has been no direct physical loss because the Drywall is "physically intact, functional and has no visible damage."...

> The court find that the Ward Residence has suffered a direct physical loss, based on a review of the relevant precedent.

> \*          \*          \*

> The majority of cases appear to support (the insured's) position that physical damage to the property is not necessary, at least where the building in question has been rendered unusable by physical forces. For example, in <u>Hughes v. Potomac Insurance Co</u>., 199 Cal. App.2d 239, 18 Cal. Rptr. 650 (1962), the land around the insured's home fell away in a landslide, leaving the home perched on a cliff. The court held that this constituted a physical loss to the dwelling, stating as follows:

>> To accept (the insurer's) interpretation of its policy would be to conclude that a building which has been overturned or  which has been placed in such a position as to overhang a steep cliff has not been "damaged" so long as its paint remains intact and its walls still adhere to one another. Despite the fact that a "dwelling building" might be rendered completely

> useless to its owners, appellant would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected. Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner.
>
> Id. at 248–249, 18 Cal. Rptr. 650; see also Essex v. BloomSouth Flooring Corp., 562 F.3d 399, 406 (1st Cir. 2009) (applying Massachusetts law and finding that unpleasant odor was physical injury to property); Motorists Mutual Ins. Co. v. Hardinger, 131 Fed.Appx. 823, 825–27 (3d Cir.2005) (applying Pennsylvania law and finding that bacteria contamination of well water would constitute direct physical loss to house if it rendered it unusable); Western Fire Ins. Co. v. First Presbyterian Church, 165 Colo. 34, 437 P.2d 52, 55 (1968) (en banc ) (gasoline fumes which rendered church building unusable constitute physical loss); Farmers Ins. Co. of Oregon v. Trutanich, 123 Or.App. 6, 858 P.2d 1332, 1336 (1993) (cost of removing odor from methamphetamine lab constituted a direct physical loss); Murray v. State Farm Fire & Cas. Co., 203 W.Va. 477, 509 S.E.2d 1, 17 (1998) (home rendered unusable by increased risk of rockslide suffered direct physical loss even in the absence of structural damage).
>
> In support of its argument that physical damage requires some physical alteration or injury to the property's structure, (the insurer) cites a number of cases from other jurisdictions. The cases (the insurer) cites are all readily distinguishable, however, in that they do not involve situations in which the property in question was rendered unusable. (Citations omitted.)

See also, Pepsico, Inc. v. Winterthur Intern. American Ins. Co., 24 AD.3d 743, 896 NYS.2d 709, 711 (2d Dep't 2005) ("We reject Winterthur's contention that the plaintiffs' products were not 'physically damaged' under the ... policy issued by Winterthur. While 'physical damages' are not defined in the policy, we disagree with Winterthur that to prove 'physical damages' the plaintiffs must prove that 'there has been a distinct demonstrable alteration of the physical structure (of the

plaintiffs' products) by an external force,' in other words, that the product has gone from good to bad. It is sufficient under the circumstances of this case involving the unmerchantability of beverage products that the product's function and value have been seriously impaired, such that the product cannot be sold").

To briefly reiterate, although it would be reasonable to interpret the "physical damage" language more narrowly than the foregoing courts have interpreted that language, the interpretation given those words by those courts is reasonable. Necessarily, therefore, at a minimum, the policy language is ambiguous, and the ambiguity must be resolved in favor of the insured. Accordingly, coverage exists because (a) due to the virus[18] (which either was already in the building, or would inevitably have entered the building), the government required that the business operations in the building cease, and (b) the existence of the virus constituted physical damage because virus on the building's surfaces physically changed the condition of the surfaces. Coverage must be extended to Windber.

### (c)   Coverage Exists Under the Insuring Agreement in the "Civil Authority" Portion of the Policy

Paragraph 4 (c), on pages 2-3 of the Business Income Coverage form, titled "Civil Authority," affords coverage for Business Income if: (1) the operations were suspended because of the "action of civil authority that prohibits access to the" insured premises; (2) the civil authority's denial of access constituted a "response to dangerous physical conditions resulting

---

[18]As discussed in footnote 12 above, the immediate cause of the business suspension was the government directive, and the indirect (proximate) cause of the business suspension was the physical damage. As discussed in footnote 12, the policy language does not (unambiguously) require that the immediate cause of the business suspension have been physical damage.  To the contrary, any cause will suffice.

from the damage or continuation of the Covered Cause of Loss[19] that caused the damage";  (3) there has been damage to property "other than property" at the insured premises (but within one hundred miles of the insured premises); and (4) access was also prohibited near the damaged property.  A review of these four situations reveals that Windber is entitled to coverage.

The first requirement has been satisfied. It is reasonable to interpret the words "denial of access" to a building to encompass a government order to stay-at-home. The government directed Windber's employees to not leave their houses.  The governmental orders suspended nonessential services leaving certain employees with nothing to do.  These employees were further ordered by the government not to leave their houses.  As a practical matter, therefore, they were prohibited access to Windber's medical center.  In Friends of Danny DeVito v. Tom Wolf, 68 MM 2020 (Pa. April 13, 2020) the Supreme Court of Pennsylvania recognized that the government's stay at home order amounted to prohibiting an insured for access to its building.  In fact, the government's order was the equivalent of compelling the evacuation of business buildings.  The Supreme Court has recognized that the first requirement has been satisfied.

The second, third and fourth requirements have also been satisfied. The government acted as it did, in part, because the virus was on surfaces throughout the city (a dangerous condition), necessarily including surfaces within one mile of Windber's medical center. Moreover, as discussed in section (b)(3) of this memorandum, the presence of the virus on those surfaces constituted physical damage to property.  In fact, the government also prohibited access at those locations.   Necessarily, therefore, coverage exists under Civil Authority portion of the policy.

---

[19]As discussed above, a Covered Cause of Loss is defined, in relevant part, as "direct physical loss."

    (d)    **Windber Does Not Have to Prove That the Virus
Was Present in its Building on the Day
<u>That Windber Suspended Operations</u>**

As discussed in section (b)(2) of this memorandum, (a) because of the government directive, Windber's medical center could not be used on the day that Windber suspended operations, (b) since the medical center could not fully be used, the policy's "loss" coverage was triggered, and (c) the medical center could not be fully used whether or not the virus was present in the center.[20] Necessarily, therefore, Travelers could not deny coverage under the "loss of property" portion of the policy even if Windber cannot prove that there was a virus in its building. As discussed above, it is enough that one of the reasons for the government's stay-at-home directive was property damage (the virus on surfaces in the city).

Similarly, as discussed in section (c) of this memorandum, Windber is entitled to coverage because the virus was within one hundred miles of Windber's medical center. It is not necessary, in order for coverage to exist under the "Civil Authority" portion of the policy, that the virus have been in Windber's medical center.   The only question is whether the third, independent, reason for the existence of coverage - - the coverage based upon "damage" (section (b)(3) of this memorandum) - - also exists whether or not there was virus in Windber's medical center on the date that Windber suspended its operations. For the reasons discussed below, the answer is yes; Windber is entitled to "damage" coverage regardless of whether there had been a virus in Windber's medical center.

---

[20]All that is necessary is that there have been a loss of use of Windber's medical center.

The policy requires that the business suspension have been caused by physical "damage" to property. The policy is ambiguous because the policy does not state whether the suspension had to have been necessary because of existing damage, or whether it would be enough that the suspension was necessary because of inevitable future damage. The policy language states as follows:

> The suspension must be "caused by... damage...."

The ambiguity arises out of the fact that that language can reasonably mean two different things.

> The suspension must be "caused by ... damage" <u>that already exists</u>

> Or
> The loss must be "caused by...damage" <u>that already exists or that will exist.</u>

 The point is that <u>something</u> has to be added to the language of the policy as written. It will be the insurer's position that the "already exists" requirement is implicit from the language. It is the insured's position that, since <u>something</u> has to be added, why not the "already exists or that will exist" language?

To put it in other words, while it is certainly reasonable to interpret the policy language to require that the damage have already existed, it is also reasonable - - not nonsensical - - to interpret the policy language to require only that the suspension be the result of property damage regardless of when the damage takes place. Normally, of course, one would not suspend one's operations because of damage that did not exist; as a result, when reading the policy language, one would not initially think of future damage as being something that can cause a suspension. But future inevitable property damage <u>can</u> cause a suspension, as it did in the matter at hand. And there is

21

nothing in the policy language that unambiguously excludes coverage when a business' operations are, in fact, suspended because of inevitable property damage.   To put it in still other words, just as existing property damage is <u>known</u>, inevitable future property damage is <u>known.</u>  Under either scenario, therefore, one would be suspending operations because of <u>known</u> property damage. It is reasonable to say, therefore, under either scenario, that "the suspension was caused by <u>damage</u>." This conclusion is supported by the Pennsylvania Supreme Court Decision in <u>Friends of Danny DeVito v. Wolf</u>, <u>supra</u>., wherein the Supreme Court noted that the virus can live on surfaces for up to four days.

  Another way to reach the same conclusion - - that when one uses the word "damage," one might possibly be speaking of inevitable damage - - is to consider common parlance. Consider a hypothetical.  Suppose that Mr. Smith suspends his business on January 1 because a hurricane is on its way. Mr. Smith is later asked whether he suspended his business on January 1 because the business had been losing money. Mr. Smith responds that the suspension of his business on January 1 had been "caused by a hurricane." Mr. Smith's words are ambiguous. The suspension might have been caused by a hurricane that had already hit his building, or the suspension might have been caused by a hurricane that had not yet hit his building. The word "hurricane" can refer to a hurricane that had already taken place, or the word "hurricane" can refer to a hurricane that was inevitable. For the same reasons, the word "damage" can refer to damage that already taken place, or the word "damage" can refer to damage that was inevitable.

  As was true of Mr. Smith in the hurricane hypothetical, the government could have caused Windber to suspend its business because of damage that had already taken place, or the government could have caused Windber to suspend its business because of the  inevitability that

damage was otherwise going to take place. In either event, it would be possible to say that the government order and, therefore, Windber's suspension of operations was "caused by damage." This is reasonable.

Begin with the fact that it is reasonable to say: (a) that the government directive was caused, in part, by the government's concern that, absent a closing of the building to business, the building would inevitably become infested with virus; and (b) that as a result, the government directive can be said to have been caused by property damage (as that term is defined by the court decisions discussed above). It is reasonable to say, therefore, that one cause of Windber's suspension of operations was property damage because one cause of the government's directive was property damage. Necessarily, therefore, particularly as applied to the facts at hand, the words "caused by damage" in the insurance policy are ambiguous. Although it is certainly very reasonable to add the words "that already exists" to the policy language, it is also reasonable not to add those words.

Finally, it should also be recognized that the policy interpretation being proffered by Travelers is nonsensical, as illustrated by the following hypothetical. Suppose that an insured owns a factory, and the insured notices that one of the machine parts will break in 5 minutes unless the machine is shut down. As a result, the insured immediately shuts down the machine and suspends his operations for a week until the replacement machine part is obtained. In that scenario, there was no property damage prior to the suspension of operations. Now suppose that the insured had continued to run the machine for 5 minutes until the part broke. Under the latter scenario, the insured would be entitled to coverage for the week that he suspended his operations because the suspension would have been caused by damage that had already existed. Under the former

scenario, is the insured not entitled to coverage for the week that he suspended his operations because he did not wait the 5 minutes for the part to break before suspending his operations?

Similarly, in the matter at hand, Travelers's position is that Windber would have been entitled to coverage if the government had acted irresponsibly and issued a stay-at-home order a couple of weeks later, after the virus was everywhere. But, since the government acted responsibly, moving up the date of Windber's suspension of operations by a couple of weeks, Windber is not entitled to coverage. It would be a strange kind of argument and an equivocal type of justice that would hold that Travelers would have been obligated to pay for Windber's suspension of operations if the suspension had commenced later than it should have commenced, but Travelers is not obligated to pay for Windber's suspension of operations because the suspension commenced at the correct time.

The Pennsylvania Supreme Court's decision in Leebov v. United States Fidelity & Guaranty Co, 401 Pa. 477, 165 A.2d 82, 84-85 (1960), is consistent with the foregoing common sense analysis. The policy afforded coverage solely for the costs of remedying property damage that had already taken place. Property damage (a landslide) had taken place, but the insured sought reimbursement for the money spent to prevent additional (future) landslide damage - - that is, coverage was sought for property damage that had not yet taken place. The court, applying a fairness test, held that the insured was entitled to coverage:

> If the plaintiff [insured] had not taken immediate and substantial measures to remedy the perilous situation, disastrous consequences might have befallen the adjoining and nearby properties. If that had happened, the defendant [insurer] would have been required to pay considerably more than is involved in the present lawsuit. It would be a strange kind of argument and an equivocal type of justice which would hold that the defendant would be compelled to pay out, let us say, the sum of $100,000 if the

> plaintiff had not prevented what would have been inevitable, and yet
> not be called upon to pay the smaller sum which the plaintiff actually
> expended to avoid a foreseeable disaster. That the danger to the
> neighborhood was one of considerable substance is evidenced by the
> fact that the City authorities required the nearby owners to vacate
> their premises for a period of two months.
>
> It is folly to argue that if a policy owner does nothing and
> thereby permits the piling up of mountainous claims at the eventual
> expense of the insurance carrier, he will be held harmless of all
> liability, but if he makes a reasonable expenditure and prevents a
> catastrophe he must do so at his own cost and expense.[21]

For that additional reason, therefore, it is not necessary, even under the "damage" portion of the

policy, that Windber prove that there had been a virus on surfaces in its medical center prior to the

suspension of its business.

    **(e)**    **The Virus Exclusion Does Not Eliminate Coverage
for the Insured's "Continuing Operating Expenses"**

Since, as discussed above, coverage exists under two of the insuring agreements in the

insurance policy, the next question that has to be addressed is whether an exclusion is applicable.

The answer is no. The virus exclusion does not exclude coverage for "continuing normal operating

expenses". Judgment should be entered in favor of Windber for these claims.

The insurance policy contains an endorsement that states that "we will not pay for loss or

damage caused by ...any virus...." Coverage under the policy, however, is not limited to "loss or

---

[21]Accord <u>Aronson Associates, Inc v. Pennsylvania Nat. Mut. Cas Ins. Co.</u>, 14 Pa. D&C.3d 1, 1977
WL 181 (C.P. 1977), aff'd, 272 Pa. Super. 606, 422 A.2d 689 (1979) ("preventive measures can be
recovered where they are required to protect against a third person being harmed").

damage." Coverage also exists for "continuing normal operating expenses."[22] Specifically, coverage is afforded for any loss of "business income," and the policy defines that term to include not only  "losses" (lost income), but also "continuing normal operating expenses." Paying one's rent/mortgage/employees is not a "loss or damage." Such a payment is a business expense. And just as paying one's employees the amounts owed under their employment contracts (or paying one's rent) was not a  "loss or damage" prior to the  virus' appearance, paying one's employees (or one's rent) is not a "loss or damage" after the virus' appearance. At the very least, it is reasonable to interpret a "continuing operating expense" to be an expense as opposed (solely) to a "loss or damage."

A hypothetical illustrates the point. Suppose that, after the virus' appearance, the insured did not lose any income. The insured would not have a "loss or damage." Under the terms of the policy, however, the insured would still be entitled to coverage for his or her "continuing operating expenses." The insured would be entitled to "operating expense" coverage even though the insured did not have a "loss" - - that is, "operating expense" coverage would be owed even though the insurance company did not have to afford coverage for "loss or damage."[23] By the same token, if,

---

[22]See paragraph A(1) on the first page of the Business Income Coverage form.

[23]In fact, it is not unusual for insurance policies to afford coverage even though the insured has not incurred a loss. See, for example, the discussion in Windt, Insurance Claims and Disputes (Thomson/West 6th Ed) (2019 supplement), section 11.34, page 11-634.

> Disability policies insure against the loss of capacity to do certain work, not against loss of income. It is irrelevant, therefore, under a typically worded disability policy, even if the insured can get another job for higher pay.

See also Aetna Cas. & Sur. Co. v. Valley Nat. Bank of Ariz., 15 Ariz. App. 13, 485 P.2d 837, 840 (Div. 1 1971) (Insured's policy covered theft of funds. Money was stolen out of the insured's bank account. The insured was reimbursed by the bank, but the insured (and the entity to which she had assigned her insurance

by reason of an exclusion, Travelers were not obligated to afford coverage for "loss or damage," that would not change the fact that Travelers would still be obligated to afford "operating expense" coverage - - a coverage being sought in the matter at hand.

In short, it would have been different if the exclusion had been written to eliminate any coverage that would otherwise have existed. For example, the American Association of Insurance Services has issued a virus exclusion endorsement, form CL0700 1006, that states (1) that it "applies to all coverages... that are provided by the policy," and (2) that it applies to "loss, cost or expense."[24] That is not, however, what the Travelers exclusion says. At the very least, it is reasonable to read the Travelers exclusion as applying solely to claims for "loss or damage," and not to claims that are not for "loss or damage."

To put it in other words, there is an inconsistency in the insurance policy. The insuring agreement states that there is coverage for "the actual loss of 'business income.'" The definition of "business income" in the policy, however, does not limit the coverage to an insured's "losses." The policy defines "business income," in relevant part, as follows:

---

claim) were still entitled to collect the insurance since, under the terms of the policy, an insurable loss had taken place); Gustafson v. Central Iowa Mut. Ins. Ass'n, 277 N.W.2d 609, 612-13, 7 A.L.R.4th 484 (Iowa 1979) (collecting 12 cases from around the country holding that the insured was entitled to collect insurance even though, by virtue of a third party's payment to the insured for the same loss, the insured ended up with a double recovery); Wolf v. Home Ins. Co., 100 N.J. Super. 27, 241 A.2d 28, 38-39 (Law Div. 1968), judgment aff'd, 103 N.J. Super. 357, 247 A.2d 345 (App. Div. 1968) (Insured had contracted to sell his property prior to a fire, and after the fire, the insured received the full contract price. Nevertheless, court held that the insurance policy had to be applied as written, so that the insured was entitled to all of the policy benefits. The policy language called for paying the insured his loss, and the time of the loss under the policy language was the date of the fire, not the subsequent date when the insured was paid by the buyer); New Ponce Shopping Center, S.E. v. Integrand Assur. Co., 86 F.3d 265, 268-69 (1ˢᵗ Cir. 1996) (insured is entitled to coverage when a building that the insured intends to demolish is destroyed by fire).

[24]See Exhibit "B" hereto.

> Business income means net income ... and continuing normal operating expenses.

If one plugs that definition into the insuring agreement, the policy would read as follows:

> Coverage exists "for the actual loss <u>of</u> net income."

AND

> Coverage exists "for the actual loss <u>of</u> continuing operating expenses."

The latter language does not even make sense. There can be a loss <u>from</u> continuing operating expenses, but there is no such thing as a loss <u>of</u> continuing operating expenses. Moreover, if the word "of" were changed to "from," the coverage would be materially different. For example, in the hypothetical discussed above, the insured would no longer be entitled to coverage if the government replaced the insured's lost revenues. In other words, in order to cause the exclusion to apply to "continuing operating expenses," a court would have to rewrite the policy in order to make it more favorable to the insurer, something that courts are not allowed to do.

Further proving the point, the Business Income insuring agreement in the policy is not the only insuring agreement in  the policy that expressly creates coverage for expenses over and above the coverage afforded for loss/damage. Paragraph 3 (b), on the fifth page of the Property Coverage form, creates coverage for "expenses" incurred by the insured that would not otherwise have been incurred had it not been for the loss/damage. Similarly, paragraphs 2 and 5 (a) on pages one and five of the Business Income form provide coverage for various expenses. Manifestly, an exclusion that is limited to eliminating coverage solely for loss/damage is not an exclusion that eliminates coverage for those "expenses."

Travelers will likely respond to the foregoing analysis by arguing that when the exclusion states that "we will not pay for loss or damage" caused by a particular risk, what is meant is that the insurer "will not pay for" the loss or damage to property that gives rise to the insured's loss/damage; what is not meant is that the insurer "will not pay for" the insured's loss/damage. Even if that policy interpretation were reasonable, however, it is also reasonable to interpret the "loss or damage" language to refer to the insured's loss/damage.[25]

If the exclusion had been intended to mean what the insurer contends that it means, the exclusion would have stated that "we will not pay if the loss or damage (giving rise to the insured's loss/damage) is caused by a particular risk. The exclusion, however, uses the word "for": "we will not pay for loss or damage caused" by a particular risk. The word "for" indicates that the loss/damage being referred to is the loss/damage that the insurer is being asked to pay, not to the loss/damage that gave rise to the loss/damage that the insurer is being asked to pay.

To put it in other words, one reasonable interpretation of the word "for" is "as the equivalent of." The insurer will, absent an applicable exclusion, pay "for" the insured's loss/damage; the insurer will pay an amount as the equivalent of the insured's loss/damage.

The decision in Farmers Texas County Mutual Insurance Company v. Zuniga, 548 SW.3d 646, 652-53 (Tex. App. San Antonia 2017) , is illustrative. In that case, the policy afforded coverage for damages "for" bodily injury, not for damages "arising out of" bodily injury. As a result, coverage did not exist for punitive damages. "The plain meaning of the word 'for' is 'in

---

[25] As discussed in Oregon Shakespeare Festival Assn. v. Travelers Ins. Co., 2016 WL 3267247 (D. Or. March 16, 2017), vacated by stipulation of the parties, 2017 WL 1034203, the word "loss" can be used to refer to "the amount of an insured's financial detriment, "and the word "damage" can be used to refer both to "loss due to injury" and to "harm to (a) person."

exchange as the equivalent of' .... Thus, the Policy's promise to pay damages for bodily injury was

Farmer's commitment to pay a sum of money as compensation in exchange as the equivalent of

the physical damage to the injured person's body."[26]   By analogy, in the matter at hand, the subject

exclusion does not state that "we will not pay <u>as a result of</u> (arising out of) loss or damage caused"

by a particular risk. The exclusion states that "we will not pay for loss or damage" (we will not

---

[26]See generally  <u>Cincinnati Ins. Co v. H.D. Smith, LLC</u>, 829 F.3d 771, 774 (7th Cir. 2016).

> The policy that Cincinnati issued to H.D. Smith covers suits seeking damages "because of bodily injury." Such a policy provides broader coverage than one that covers only damages "for bodily injury." <u>Medmarc Cas Ins. Co v. Avent Am., Inc</u>. 612 F.3d 607, 616 (7th Cir. 2010) (applying Illinois law_). We expressed that result with the following example:
>
> > (A)n individual has automobile insurance; the insured individual caused an accident in which another individual became paralyzed; the paralyzed individual sues the insured driver only for the cost of making his house wheelchair accessible, not for his physical injuries. If the insured driver had a policy that only covered damages "for bodily injury" it would be reasonable to conclude that the damages sought in the example do not fall within the insurer's duty. However, if the insurance contract provides for damages "because of bodily injury" then the insurer would have a duty to defend and indemnify in this situation. Id.

<u>Greenwood Cemetery, Inc v. The Travelers Indem. Co</u>., 238 Ga. 313, 316, 232 SE.2d 910, 913 (1977).

> The word "for" has numerous meanings. The insurer would read the word "for" as meaning 'equivalent to' (and therefore not greater than) or 'to the amount, value or extent of.' The insured would read the word "for" as meaning 'by reason of' or 'because, on account of.' See Black's Law Dictionary (Rev. 4th Ed., 1968); Webster's Third New International Dictionary 1967. See also <u>Lumbermens Mutual Casualty Co v. Yeroyan</u>, 90 N.H. 145, 5 A.2d 726 (1949); <u>American Ins. Co v. Naylor</u>, 103 Colo. 461, 87 P.2d 260 (1939).

make a payment equivalent to the loss or damage) if the loss/damage (that the insurer would otherwise have had to make a payment for) is caused by a particular risk.

Note, too, that in the first sentence of the Business Income form, the word "loss" is used to refer to the "loss of business income you sustain." It does not refer to the "loss that the property sustains." It is the next sentence that refers to a "loss" to property. For that additional  reason, the word "loss" in the exclusion can refer either to the insured's loss or to a loss to property. The exclusion is ambiguous. And as discussed above, since the exclusion applies only to an insured's loss, the exclusion does not apply to an insured's continuing expenses, since continuing expenses do not constitute a loss.

Summarizing, the fact that the policy excludes coverage for an insured's loss/damage does not mean that the policy excludes coverage for an insured's "expenses." In addition, by the same token, it is reasonable to read the words "loss or damage" in the virus exclusion to be addressing the amount owed by the insurer. That is, it is reasonable to read the exclusion to be addressing what the insurer owes to the insured - - for the insured's loss or damage - - as a result of the underlying loss or damage to property. The words "loss or damage" in the exclusion are not addressing the loss/damage that gave rise to the insured's loss/damage.   Travelers contends that for the foregoing reasons, the virus exclusion eliminates coverage for a claim for lost income (a "loss").  Travelers cannot contend that the exclusion does not (unambiguously) eliminate coverage for continuing operating expenses (which do not unambiguously constitute a "loss").  Windber is entitled to coverage.

**(f)**   **If Windber Were Not Entitled to Coverage for "Continuing Operating Expenses," The Coverage Afforded by the Policy Would Be Illusory**

As discussed above, the policy affords coverage for "Business Income," and the policy defines that term to include two things: (1) lost income, and (2) "continuing normal operating expenses."[27] Plugging each part of the definition into the insuring agreement, the policy reads as follow:

> We will pay the actual loss of profits you sustain due to the necessary suspension of your operations.

> AND

> We will pay the actual loss of "continuing normal operating expenses" you sustain due to the necessary suspension of your operations.

The latter coverage is nonsensical. Continuing expenses are never owed <u>because of</u> ("due to") a suspension of operations; they are owed <u>despite</u> a suspension of operations. For example, monthly rent that an insured has to pay is never owed because of a suspension of operations; the monthly rent has to be paid despite a suspension of operations.   Moreover, not only is the policy language nonsensical, but if the "loss of" operating expenses "due to a suspension of operations" requirement were enforced as written, the coverage for operating expenses would be illusory.

---

[27]See the first page of the Business Income Coverage form.

A hypothetical illustrates the point. Suppose that an insured suspends its operations at the insured premises because an explosion destroys the building.  Manifestly, the insured would be entitled to coverage for its continuing operating expenses because: (a) those expenses are encompassed by the policy's definition of "Business Income," [28] and (b) the insured's Business Income claim was "due to the necessary suspension of your operations ...." Nevertheless, the insured in the hypothetical would not be able to collect for its continuing operating expenses because those expenses were not owed because of the suspension of operations. The insured's obligation to pay its expenses (e.g., rent) was not "due to" the suspension of operations. In fact, the insured's obligation to pay its continuing expenses has nothing whatever to do with the suspension of operations. Accordingly, under the terms of the policy, an insured's continuing expenses can <u>never</u> be covered because the expenses can never constitute a loss due to a suspension of operations.

In summary, a court has only two options for dealing with claims for "continuing normal operating expenses": either

> (1)     allow the insured to recover those expenses even though continuing expenses (e.g., the monthly rent) are <u>never</u> "due to the necessary suspension of... operations"- - e.g., the rent has to paid whether or not there was a suspension of operations.

> or

> (2)   never allow the insured to recover those expenses - - effectively rewriting the policy to change the definition of "Business Income" to delete the portion defining the term to include "continuing

---

[28]It is irrelevant, in the hypothetical, whether the insured incurred a loss of profit due to the suspension of its operations.

operating expenses" - - because continuing expenses are never due
to a suspension of operations.

If for no other reason, the Court must adopt the first option because if the Court were to hold that

coverage could never exist for "continuing normal operating expenses" because continuing normal

expenses can never be a loss caused by a suspension of operations, the coverage for continuing

normal expenses would be illusory. That is, adopting the second option set forth above would

mean that although the policy expressly affords coverage for continuing normal expenses, the

policy will never, in fact, afford coverage for continuing expenses. As discussed in Windt, section

6.2, page 6-48, it is a fundamental principle of insurance law that a court will not interpret a policy

to create illusory coverage.

> (A) court will not allow an exclusion to eliminate coverage
> that is expressly and specifically provided for in the same policy
> form. More generally stated, a policy will not be interpreted to create
> illusory coverage.[29]

---

[29]Among the cases cited in Windt and the 2020 supplement are  Glen Lincoln, Inc. Zurich Ins. Co.,
945 F. Supp. 844 (E.D. Pa. 1996), affd in part rev'd in part, 142 F.3d 428 (3d Cir. 1998) ("The law does
not countenance illusory coverage");Monticello Ins. Co. v. Mike's Speedway Lounge, Inc., 949 F. Supp.
694, 699 (S.D. Ind. 1996) ("an insurance policy provides illusory coverage when a premiums was paid for
coverage which would not pay benefits under any reasonably expected set of circumstances"); Hullverson
Law Firm, P.C. v. Liberty Ins. Underwriters, Inc. 25 F.Supp.3d 1185, 1191-95 (E.D. Mo. 2014) (coverage
illusory because "the policy's definition of personal injury appears to provide coverage for (the insured's)
advertising activities, but the definition of wrongful act then takes that coverage away); Sletten & Brettin
Orthodontic, LLC v. Continental Cas. Co., 782 F.3d 931, 938 (8th Cir. 2015) (Minnesota law) ("illusory
coverage doctrine operates as a remedy where an insured seeks coverage under a provision that purports to
provide coverage but such coverage turns out to be functionally nonexistent"); McAninch v.Wintermute,
491 F.3d 759, 769–70 (8th Cir. 2007) (Arkansas law) (Insurer's policy interpretation rejected because "(i)f
the policy only provides coverage to directors sued solely because of their status . . . language (in the policy)
is rendered nugatory"); Pharmacists Mut. Ins. Co. v. Myer, 2010 VT 10, 993 A.2d 413, 418 (Vt. 2010)
(Exclusion for defamatory statements that the insured "had reason to believe" were false did not bar
coverage for negligently made defamatory statements because such an interpretation "would virtually
eviscerate the coverage provision for" defamation); First National Bank of Manitowoc v. Cincinnati Ins.
Co., 485 F.3d 971, 981 (7th Cir. 2007) (Wisconsin law) (exclusion not enforceable because it operated as
a "complete cancellation of (the) coverage granted in the insuring agreement"); Radil v. National Union
Fire Ins. Co. of Pittsburgh, Pa., 207 P.3d 849, 857 (Colo. App. 2008), cert. denied, 2009 WL 1383815
(Colo. 2009) (Policy affords coverage for nonowned vehicles, but policy's definition of nonowned vehicles

**CONCLUSION**

Windber is entitled to coverage under the Travelers' Policy under both the "Business Income" and the "Civil Authority" portions of the policy. Further, there are no exclusions applicable to the claims for coverage of Windber. "Continuing normal operating expenses" are covered by the policy. Accordingly, it is respectfully requested that Judgment be entered in favor of Windber and against Travelers.[30]

Respectfully,

HAGGERTY, GOLDBERG, SCHLEIFER   &   SCHMIT KRAMER, P.C.
KUPERSMITH, P.C.

BY:   /s/ James Haggerty                        BY:   /s/ Scott Cooper
JAMES C. HAGGERTY, Esquire              SCOTT B. COOPER, Esquire
PA Attorney I.D. # 30003                       PA Attorney I.D. #70242
1835 Market Street, Suite 2700              209 State Street
Philadelphia, PA  19103                         Harrisburg, PA  17101
(267) 350-6600                                       (717) 232-6300

---

did not include vehicles that were not owned, leased, rented or borrowed. Coverage for nonowned vehicles was held to be illusory); Murray Ohio Mfg. Co. v. Continental Ins. Co., 705 F. Supp. 442, 444 (N.D. Ill. 1989) ("the law does not countenance illusory coverage"); Liberty Life Ins. Co. v. Commercial Union Ins. Co., 857 F.2d 945, 951 (4th Cir. 1988) (policy will not be interpreted so as to make any of the coverage given ''illusory''); Schwartz v. State Farm Mut. Auto. Ins. Co., 174 F.3d 875, 879 (7th Cir. 1999) (Indiana law) (''an insurance provision is considered illusory if a premium was paid for coverage which would not pay benefits under any reasonably expected set of circumstances'').

[30]   The recent decision of the Michigan Court in Gavrilides Management Company et al. vs. Michigan Insurance Co. is of no consequence. That decision did not consider the issues in the case at bar. See Fernandez v. Farmers Insurance Co., 115 N.M. 622, 627, 857 P. 2d 22, 27 (1993) ("Cases are not authority for propositions not considered"). The arguments raised by Windber in this case were not addressed by the Michigan Court. Therefore, that decision is of little or no value. See Rivota v. Fidelity & Guaranty Life Insurance Co., 497 F. 2d 1225, 1229 (7th Cir. 1974) ("We need not regard as strictly binding a state decision in which the rule now argued may have failed for want of an advocate").

JACK GOODRICH & ASSOCIATES          SHUB LAW FIRM, LLC


BY:  _/s/ Jack Goodrich_____          BY:  _/s/ Jonathan Shub_____
JOHN P. GOODRICH, Esquire          JONATHAN SHUB, Esquire
PA Attorney I.D. #49648          PA Attorney I.D. #53965
429 Fourth Avenue          134 Kings Highway East, 2nd Floor
Pittsburg, PA  15219          Haddonfield, NJ  08033
(412) 261-4663          (856) 772-7200

Attorneys for Plaintiffs